## HOENIG v. PARKER.

(Court of Appeals of District of Columbia. Submitted May 10, 1920. Decided June 2, 1920.)

No. 1307.

**1. Patents �köö91(3)—Finding as to priority not sustained by the evidence.**

In an inference proceeding in the Patent Office, a finding that one of the parties first conceived and disclosed the invention *held* contrary to the evidence.

**2. Patents �køö87—Burden of showing abandonment on one asserting it.**

In an interference proceeding in the Patent Office, the burden of affirmatively proving abandonment of an invention is on him who asserts it.

**3. Patents �køö83—Delay in filing application explained by financial condition.**

In an interference proceeding in the Patent Office, failure of a party for about 10 months after reducing his invention to practice to file his application *held* sufficiently explained by his financial condition, so that there was no abandonment.

Appeal from Commissioner of Patents.

Triparty interference between William M. Parker, Harry Edward Hoenig, and Julian H. Kendig. From a decision granting William M. Parker priority, Harry Edward Hoenig appeals. Reversed.

E. Hume Talbert, of Washington, D. C., for appellant.

Geo. E. Tew, of Washington, D. C., and Geo. A. Rockwell, of Boston, Mass., for appellee.

SMYTH, Chief Justice. This was a triparty interference, involving the application of Parker, filed January 8, 1915; Kendig, filed in February, 1915; and Hoenig, filed in October, 1915. It embraces but a single count, which reads:

"A device of the character described comprising a member with a passage; a member for attachment to a support and having a fixed head, the body of said attachment member extending through said passage, said fixed head positively preventing accidental withdrawal of the first-mentioned member from one end of said attachment member; and means to positively limit, at a predetermined point, movement of the first-mentioned member toward the tip of said attachment member."

The invention relates to two-part insulators and means for holding the parts in assembled relationship. The means consist of a nail passing through perforations in the cap and base portions, and a struck-up portion on the shank of the nail for positively limiting the movement of the nail and base in one direction. The issue is directed broadly to the means for positively limiting the movement.

The idea was to provide an insulator which could be assembled at the factory, shipped to the point of use, and then readily installed. The Examiner of Interferences was of opinion that to prove reduction to practice it was necessary to show commercial use of the device, involving assembling, shipment, handling, and installation. He held that Parker and Kendig were entitled to their respective filing dates for reduction to practice, and that Hoenig should be given the last of December, 1914, for his time of conception, but that, not having put

the device into commercial use and because of the shortness of the nail used, he had not actually reduced to practice, and, since he was not diligent between the time of conception and the date of filing, he must be confined to the latter date. Parker was therefore awarded priority. Kendig did not appeal. Hoenig did.

The Board of Examiners held that Hoenig was entitled to the date given him by the Examiner of Interferences for conception; also that the device was of such a simple nature that it needed no test to show that it would do what was claimed for it, and that Hoenig should be allowed December 31, 1914, for actual reduction to practice. Differing, however, from the Examiner of Interferences with respect to Parker, they ruled that he, having prepared his application December 24, 1914, and filed it with due diligence January 8, 1915, was entitled to December 24 as the date of his invention, and hence to priority over Hoenig. The First Assistant Commissioner, ignoring Parker's application date, ruled that he was limited to his filing date, January 8, 1915, for constructive reduction to practice, rejected the testimony on behalf of Hoenig with respect to a conception and reduction to practice in December, 1914, and held that he had failed to establish that he had disclosed the invention prior to Parker's filing date, January 8, 1915. In consequence he awarded priority to Parker.

Parker asserts that he conceived and reduced to practice in 1913. We agree with the First Assistant Commissioner that the record does not sustain him in this. He is not entitled to any date before December 24, 1914, the date accorded him by the board of examiners.

Hoenig claims that about the middle of November he went to Pittsburgh to pay interest on a note given to the Baird Machinery Company in part payment for a large machine that he had previously purchased. While there he had a conversation with the purchasing agent of the Iron City Electrical Company, who spoke of the salability of a two-piece porcelain knob, if it was economically put together for shipping and resale. Hoenig, who had extensive experience in porcelain die making, says that shortly after his return from Pittsburgh he conceived the device of the issue, and about November 18 or 20 commenced to make a die to be used in producing it. He completed the die near January 1, 1915. On cross-examination he exhibited a canceled check dated November 18, 1914, and payable to the Baird Machinery Company, for the purpose of supporting his statement that he had paid the company money at that time. After completing the die, he assembled, he says, two knobs—the insulators are sometimes spoken of as knobs—in the manner called for by the claim of the issue. This was done, he declared, in the presence of C. C. Smith, Worthen, and Lyde. The next day he showed the assembled knobs to Hellyer, J. T. Smith, and Hetzel.

C. C. Smith fully corroborated him in important particulars. He testified that he was a porcelain die maker of several years' experience; that he was employed by Hoenig, and commenced work on the dies about the 1st of December, 1914. Hoenig supplied him sketches from which he worked. Along near the middle of December he learned that the dies on which he was employed were for the purpose of producing the device of the issue. One of the means by which he

recalled the dates was the fact that, at the time he worked on the dies, he also did some work for the Louthan Supply Company. This he remembers because from the work done for that company Hoenig, who was financially embarrassed, procured the money to pay him wages which were past due and for which he had been compelled to institute suit against Hoenig before one Bennett [presumably a justice of the peace, though he calls him a notary public], sometime before Christmas, 1914. He says that he saw Hoenig put a die on the press and crimp two nails on it some two weeks after work on the dies had been started by him. Having described the die which was used, he then described the fins produced by it on the nail. He said in that connection that two halves of a knob were put together with a nail through it, and after the nail had been punched it left two little fins, the struck-up parts—one on each side of the nail. He thus indicated the invention of the issue. His testimony shows conception and disclosure by Hoenig before the middle of December, 1914, and reduction to practice as early as January 1, 1915.

J. T. Smith, after describing the invention by saying that it was a nail put through two parts of a knob, with two little "wickers" pressed on the nail, declared that he first saw it in Hoenig's machine shop the first week in January, 1915, and he fixes the time by the circumstance that Hoenig was then back in his payments for some real estate which he had purchased from Smith in 1913. Hoenig, in attempting to excuse his failure to make the payments when they became due, showed Smith the knob as a thing out of which he might get the money necessary to discharge his debt.

Worthen testified that he was also an employé of Hoenig; that he had talked with him about a patent knob in which he was interested, and then he described the knob by saying that it had a nail run through it "and flattened out on the end or near the end, after it was assembled." He fixes the time of the conversation by a job done by him for one Hammerton, but the year in which he did it is not satisfactorily established.

[1] The other persons referred to above as being cognizant of what Hoenig had done were not called, but there is nothing to show that they were not available to Parker, if he desired them. If C. C. Smith's story that he sued Hoenig for his wages near Christmas, 1914, was not true, it was very easy for Parker to contradict it. He tied his testimony to Christmas. It is most improbable that the things related took place at Christmas, 1915, for that was after all the parties to the interference had filed. On the other hand, if they transpired at Christmas, 1913, it would place Hoenig ahead of his rivals beyond a doubt. Hoenig and his witnesses were not mistaken. They either told the truth or deliberately falsified, and there is nothing in the record which would warrant so harsh a conclusion as the latter. We agree with the Board of Examiners that the invention is a simple one, and that any person by trying a specimen could determine at once whether or not it would stand the strains to which it would be subjected in actual use. The record establishes that Hoenig conceived and disclosed the invention before the middle of December, 1914, that he

reduced it to practice as early as January 1, 1915, and was diligent in the meantime.

[2, 3] It is asserted by Parker that Hoenig, even if he was the first to conceive and reduce to practice, abandoned his invention. We do not think so. The burden of affirmatively proving abandonment is on him who asserts it. Hathaway v. Field, 48 App. D. C. 370, 371, and cases there cited. The only evidence upon which Parker relies in this regard is the failure of Hoenig for about ten months after reducing to practice to file his application. This failure, we think, is sufficiently explained by his financial condition, already referred to.

The decision of the Patent Office is reversed, and priority awarded to Harry Edward Hoenig.

Reversed.

VAN ORSDEL, Associate Justice, took no part in the consideration or decision of this case.